## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DENNIS G. CAPPELL,

     Plaintiff,

v.                                    Case No. 2:13-CV-2303-JTM

DEPARTMENT OF THE ARMY,
SECRETARY,

     Defendant.


## MEMORANDUM AND ORDER

Plaintiff Dennis G. Cappell seeks monetary damages from his past employer, defendant Department of the Army ("defendant") for alleged race discrimination, harassment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). This matter is before the court on defendant's Motion for Summary Judgment (Dkt. 50) and Motion to Strike Deposition Correction Sheet (Dkt. 52). For the reasons stated below, defendant's motions are granted. Because defendant's Motion to Strike has direct bearing on its Motion for Summary Judgment, the court undertakes this analysis first.

### I.     Motion to Strike Deposition Correction Sheet

In its Motion, defendant seeks to strike plaintiff's deposition corrections on the grounds that the corrections were untimely and substantively altered plaintiff's testimony. Defendant deposed plaintiff, appearing *pro se*, on June 4, 2014. At the start of the deposition, plaintiff was informed that he would have an opportunity to review the transcript and make any changes or

corrections on an errata sheet.  Dkt. 52-2, at 7.  He was also advised that he would have only thirty days to make these changes or corrections; otherwise, the transcript would be deemed correct.  Dkt. 52-2, at 7.

The preliminary transcript was sent to plaintiff on June 12, 2014.  Dkt. 51-1, at 2.  The cover letter attached to the transcript reminded plaintiff that he had thirty days to review, sign, and return the transcript along with any corrections.  Dkt. 51-1, at 2.  On July 14, 2014, two days *after* the initial deadline had passed without response from plaintiff, he was again advised, in writing, to return the signature page and any corrections within ten days or the transcript would be filed without his signature.  Dkt. 52-3, at 2.  Plaintiff still failed to respond.  Given plaintiff's testimony, defendant therefore filed the pending Motion for Summary Judgment on July 24, 2014.  Four days later, on July 28, 2014, defendant received plaintiff's deposition correction sheet.[1]

Federal Rule of Civil Procedure 30(e) provides:

If requested by the deponent or a party before completion of the deposition, the deponent shall have 30 days after being notified by the officer that the transcript or recording is available in which to review the transcript or recording and, if there are changes in form or substance, to sign a statement reciting such changes and the reasons given by the deponent for making them.  The officer shall indicate in the certification prescribed by subdivision (f)(1) whether any review was requested and, if so shall append any changes made by the deponent during the period allowed.

"The Tenth Circuit construes the 30-day period for submitting changes as 'mandatory' and that deposition changes are permissible under Rule 30(e) **only** if the party submitting the errata sheet establishes that the submission was provided to the court reporter within the time limit."  *United States ex rel. Smith v. Boeing Co.*, 2011 U.S. Dist. LEXIS 12980, at *3 (D. Kan. Feb. 10, 2011)

---

[1] It appears that plaintiff certified his changes before a notary public on July 22, 2014.  Dkt. 52-4, at 3.  These changes were certified by the court reporter on July 25, 2014.  Dkt. 52-4, at 2.  Defendant's counsel did not receive these changes until July 28, 2014.

(citing *Rios v. Bigler*, 67 F.3d 1543, 1552 (10th Cir. 1995) (emphasis in original)); *see also ICE Corp v. Hamilton Sundstrand Corp.*, 2007 U.S. Dist. LEXIS 89290, at *4-5 (D. Kan. Dec. 3, 2007) (narrowly construing the 30-day requirement and striking an untimely errata sheet).

It is undisputed that the changes to plaintiff's deposition occurred more than thirty days (and indeed, more than *forty* days) after plaintiff learned of the availability of this transcript on June 12, 2014. Plaintiff has not filed any opposition to defendant's motion. While the court acknowledges plaintiff's *pro se* status, both at the time his errata sheet was due and now, it is well established in this Circuit that "a plaintiff's *pro se* status does not relieve him from complying with this court's *procedural* requirements." *Auld v. Value Place Prop. Mgmt., LLC*, 2010 U.S. Dist. LEXIS 14907, at *47 n.79 (D. Kan. Feb. 19, 2010) (citing *Barnes v. United States*, 173 F. App'x 695, 697 (10th Cir. 2006) (emphasis added)). Plaintiff was warned of the consequences of his failure to submit timely corrections to his deposition transcript. He failed to heed those warnings. As such, defendant's Motion to Strike (Dkt. 52) is granted.

## II.     Motion for Summary Judgment

### A.     Local Rule Dispute

Similarly, defendant alleges that plaintiff failed to comply with standard summary judgment procedure and respond specifically to the facts set forth in defendant's Memorandum. Instead, defendant alleges, plaintiff "opted to create his own list of facts." Dkt. 61, at 2. Defendant therefore requests that its statements of fact not specifically controverted by plaintiff be deemed admitted in accordance with Kansas Local Rules.

The Kansas Local Rules provide as follows with regard to summary judgment procedure:

(a) **Supporting Memorandum**.  The memorandum or brief in support of a motion for summary judgment must begin with a section that contains a concise statement of material facts as to which the movant contends no genuine issue exists.  The facts must be numbered and must refer with particularity to those

portions of the record upon which movant relies. All material facts set forth in the statement of the movant will be deemed admitted for the purpose of summary judgment unless *specifically controverted* by the statement of the opposing party.

(e) **Duty to Fairly Meet the Substance of the Matter Asserted**. If the responding party cannot truthfully admit or deny the factual matter asserted, the response must *specifically* set forth in detail the reasons why. All responses must fairly meet the substance of the matter asserted.

D. KAN. R. 56.1(a), (e) (emphasis added).

The only factual statements from defendant's motion *specifically controverted* by plaintiff are: 5, 7, 13, 18, 19, 26, 27, 30, 32, 36, 40, 41, 53, 57, 60, and 61. Defendant therefore argues that the remaining facts set forth in its Memorandum in Support of Summary Judgment should be deemed admitted for purposes of summary judgment. The court agrees. Again, plaintiff's *pro se* status does not relieve him from complying with the court's procedural requirements. *Auld*, 2010 U.S. Dist. LEXIS 14907, at *47 n.79. Therefore, those facts not specifically controverted by plaintiff are deemed admitted for purposes of summary judgment.

## B.    Factual and Procedural Background

Plaintiff's allegations stem from his time as a dual-status employee at the Army Air Support Facility Olathe ("ASF Olathe") located in Gardner, Kansas. Plaintiff is an African-American who was hired in 2004 as a federal civilian employee. As a condition of his employment, he also maintained membership in the Army Reserves. Plaintiff generally worked as a Maintenance Administrative Technician, but, when he received military orders, would report to duty as a member of the military as a Chinook helicopter pilot in training. Plaintiff often reported to military duty at ASF Olathe. During the time in question, plaintiff's civilian hierarchy was as follows: (1) immediate supervisor Russell Reese ("Reese"), (2) senior civilian/second-level supervisor rater Ronald Erkie ("Erkie"), and (3) third-level supervisor Aviation Support Facility Supervisor Michael Walsh ("Walsh").

4

## 1.      Civilian Issues

As a Maintenance Administrative Technician, plaintiff's primary civilian responsibility was collecting timesheets and inputting payroll for all ASF Olathe employees.  Because his military orders sometimes took him away from these duties for months at a time, other civilian employees were tasked with inputting payroll in plaintiff's absence, ensuring that all ASF Olathe employees continued to get paid in a timely manner.  Plaintiff was responsible for verifying that all payroll matters and materials were correct and in order upon his return from his military duties.

### a.      Race Discrimination Claims[2]

For much of 2009, plaintiff was on military orders and attending flight school.  In his absence, a Caucasian civilian employee, Leonard Rickard ("Rickard"), assumed responsibility for inputting payroll for ASF Olathe.  On his 2009 annual evaluation, plaintiff was cited for numerous payroll discrepancies that were discovered by an audit.  Plaintiff discussed these errors with his immediate supervisor, Reese, and questioned why they were included on his evaluation when the errors had been made by Rickard while plaintiff was on military orders.  In response, Reese allegedly told plaintiff that it did not matter if he personally made the mistakes; he had to be the "fall guy." According to plaintiff, he was forced to take the blame for Rickard's mistakes solely because of his race.  Defendant disputes this allegation, claiming that plaintiff was told that "owing to the nature of his job duties, he [was] ultimately the person responsible for

---

[2] Plaintiff alleges six discrete claims in his Complaint, each of which can be categorized as either race discrimination or retaliation for engaging in protected activity.  Based on its review of the evidence, the court recognizes that plaintiff's categorization of these discrete claims fluctuated throughout the duration of this case.  In the interest of clarity and ease of discussion, the court sets forth the following facts according to plaintiff's most recent categorization of his discrete claims.

correcting pay errors, regardless of who initially made them." Dkt. 51-6, at 3.  As such, plaintiff was the "fall guy."

On April 15, 2010, plaintiff received an interim evaluation which documented four payroll issues and/or errors. Plaintiff disputed that any of the payroll errors could be attributable to him as he had, once again, been on military orders at the time the errors were made. Plaintiff's second-level supervisor, Erkie, looked into the errors and ultimately reduced the number of documented issues from four to two and asked plaintiff to sign the evaluation, acknowledging his receipt.  Plaintiff refused.  As a result, Erkie included the following comments in the evaluation:

> Mr. Cappell was briefed on his midterm review on 15 April 2010 at that time he was asked to acknowledge the face to face review.  Mr. Cappell said he would do so.  On follow up the next day it was found that he in fact did not acknowledge the review and was now refusing to do so because he did not agree with the rater assessment.  Mr. Cappell then went on military orders and was not available to acknowledge the review.  On 17 June Mr. Cappell was again asked to complete the process and acknowledge the interim review, Mr. Cappell refused to do so stating that his supervisor was a lier [sic] and his assesment [sic] was completely wrong.  Mr. Cappell said he believes that if he acknowledges the review he is agreeing with the rater assessment.  He was told that he is only acknowledging with the face to face review held on 15 april [sic] 2010.

Dkt. 51-5, at 13.

Plaintiff alleges that he was pressured by Reese and Erkie approximately eight or nine times between April 2010 and December 2010, and once between December 20, 2010, and January 1, 2011, to sign the interim evaluation.  According to plaintiff, he was pressured to sign in retaliation for a complaint he made to defendant's Equal Employment Opportunity ("EEO") Office.

In addition to an interim evaluation, civilian employees were also usually entitled to an annual evaluation of their performance.  However, for dual-status employees, annual evaluations

were only given when the individual had worked 120 *consecutive* days in his civilian position. This 120-day requirement could be extended or reduced at a supervisor's discretion.

After his 2010 interim evaluation, plaintiff was placed on military orders and remained so until early 2011.  Because of his status, plaintiff's civilian supervisors opted against issuing plaintiff an annual evaluation at the time it was normally due, December 15, 2010, and instead chose to wait until plaintiff had returned from military orders and worked 120 consecutive days. According to plaintiff's supervisors, this was done for plaintiff's benefit.  If they had issued the evaluation on time, they would have had no choice but to base it on plaintiff's subpar interim evaluation, given that plaintiff had been dispatched almost immediately thereafter on military orders.  Plaintiff views the situation differently, alleging that Caucasian employees were given special "close out" evaluations in December 2010, despite not having worked for 120 consecutive days.  Plaintiff ultimately received his 2010 annual evaluation in July 2011, after having worked 120 consecutive days.

### b.    Retaliation Claims

In February 2011, the military unit assigned to ASF Olathe was preparing to deploy to Afghanistan.   Given the amount of work necessary to arrange the deployment, Walsh temporarily assigned plaintiff to the Flight Operations Office to assist ASF dispatcher Carolyn Simpson ("Simpson") with answering phones and monitoring the facility's security cameras and gates.   According to Walsh, this was not a *re*-assignment of duties; rather it was just an additional workload.  To effectuate this change, plaintiff's workspace was temporarily relocated to the Flight Operations Office near Simpson, which was upstairs from plaintiff's original location.

On February 4, 2011, Walsh sent an email to Simpson's supervisor, Bric Lewis ("Lewis"), notifying him of the move:

> Bric, I am going to administratively assign Dennis to Ops as "Other duties as required" for a period of time to help out Carol and you. I still want him to work on getting his password back for timecards and take over that duty again. This does not negate any work that maintenance needs done. Tony and Russell can pass on tasks to Dennis through you. Give him a cubicle to work from. We need assistance with answering phone calls, visitors at the gate/door, administrative stuff, etc. Please keep him gainfully employed.

Dkt. 51-2, at 9.[3]

Although there was some initial confusion as to whether plaintiff's supervisory structure changed, Walsh ultimately clarified the situation, telling plaintiff that he still reported to Reese and Erkie, but also temporarily received orders from Lewis. The ASF Olathe military units were deployed in March 2011. Plaintiff returned to his original workspace in July 2011. Plaintiff now alleges that he was not immediately returned to his original workspace in retaliation for his December 2010 EEO complaint.

Simultaneous with this temporary workspace relocation, plaintiff's supervisors began noticing that his sick-leave use fit a pattern designated by defendant's Office of Personnel Management as potential sick-leave abuse. This pattern consisted of: (1) using more than sixty hours of sick leave per year with no documented special circumstances, (2) consistently using sick leave on the day before a weekend, and (3) taking a full day of sick leave for a short appointment. Plaintiff's supervisors had also become concerned that plaintiff was "shopping" for sick leave approval from different supervisors. Therefore, Walsh and Erkie informed plaintiff that they, not Reese or Lewis, would have to approve plaintiff's sick-leave requests. In accordance with defendant's standard policies, plaintiff was also asked to provide documentation

---

[3] The email was also sent to plaintiff's supervisors, Reese and Erkie. Dkt. 51-2, at 9.

of medical appointments and to give three days' notice whenever possible.  Plaintiff alleges that this change in procedure was in retaliation for his EEO complaint.

### 2.    Harassment/Hostile Work Environment

In addition to these discrete acts, plaintiff also alleges that he was the victim of a hostile work environment and harassment.  According to plaintiff, at some point, an unknown person wrote the word "rat" on a whistle-blower poster outside of his office.  Plaintiff notified his supervisor and the poster was immediately removed.  Plaintiff also alleges that his third-level supervisor, Walsh, tried to incite racial tension between plaintiff and another employee by telling the other employee that plaintiff had complained about his racial jokes.

### 3.    Military Issues

On December 15, 2010, as a result of his failure to pass readiness-level testing, plaintiff was issued a non-medical suspension, grounding him from flying Army helicopters.  Plaintiff alleges that he would not have failed these requirements had he not been under the stress caused by the situation with his civilian employment.  On April 1-2, 2011, the Army convened a Flight Evaluation Board ("FEB") to hear testimony, review plaintiff's flight records, and assess his skills as a helicopter pilot.  The FEB concluded that plaintiff engaged in a "substandard performance of duty" and recommended dismissal.  Dkt. 51-4, at 9.

### 4.    EEO Complaint

Plaintiff made initial contact with an EEO counselor on December 20, 2010.  He filed a formal complaint on January 29, 2011, alleging discrimination based on race and color.  On March 25, 2011, defendant's EEO Office confirmed the following list of claims as those that had been accepted for investigation:

    a.  On December 15, 2010, your annual evaluation was due for the rating period of October 1, 2009 through September 30, 2010; however, as of February 19, 2011, you have not received your evaluation.

    b.  In April 2010, statements were placed in your interim review for the appraisal period of October 1, 2009 to September 30, 2010, that you feel are inaccurate, causing you to deny acknowledgement of the review.

    c.  April to October 2010, you felt you were constantly being pressured to acknowledge your interim review.

    d.  On multiple occasions, since December 2008, you have been blamed for discrepancies for which you were not responsible.

    e.  On February 9, 2011, Mr. Ronald Erkie, your senior rater, informed you that your immediate supervisor would be changed to Mr. Bric Lewis, your leave requests would be made in accordance to new guidelines, and you were being moved to a different work area.

Dkt. 51-14, at 2-3.

On April 8, 2013, defendant issued a final decision on these claims, finding that plaintiff was not the victim of discrimination.

### 5.    Resignation

Plaintiff submitted a letter of resignation from his civilian position on August 8, 2012, to be effective August 20, 2012 – eight months prior to defendant's decision on plaintiff's EEO claims. Plaintiff's resignation, tendered more than a year after his last complained-of incident, claimed that his decision to resign was "largely due to the emotional damage caused by the actions of the three named individuals in [his] EEOC complaint." Dkt. 51-12, at 2.

On June 21, 2013, plaintiff filed, *pro se*, a suit against defendant in the United States District Court for the District of Kansas alleging discrimination based on race/color, harassment/hostile work environment, and retaliation. Defendant now seeks summary judgment on all of plaintiff's claims.

### III.     Legal Standard for Summary Judgment

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a).  A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.  *Haynes v. Level 3 Communs.*, 456 F.3d 1215, 1219 (10th Cir. 2006).  The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.  *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  The nonmovant must then bring forth specific facts showing a genuine issue for trial.  *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).  These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits – conclusory allegations alone cannot survive a motion for summary judgment.  *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores*, 144 F.3d 664, 670 (10th Cir. 1998)).  The court views all evidence and reasonable inferences in the light most favorable to the non-moving party.  *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

### IV.     Analysis

Based upon plaintiff's complaint and the pretrial order (Dkt. 49), the court understands plaintiff's claim to be as follows: (1) constructive discharge from his civilian position, (2) removal from his military position, (3) race/color discrimination, (4) hostile work environment/harassment, and (5) retaliation.

A.     **Constructive Discharge from Civilian Position**

In the pretrial order, plaintiff contends that the situation at ASF Olathe was "intolerable" and he was therefore "forced to resign under constructive discharge . . . ." Dkt. 49, at 9.  As a result, he is due lost pay and benefits.  Defendant disagrees, arguing that plaintiff's claim for constructive discharge should be dismissed for lack of jurisdiction due to plaintiff's failure to administratively exhaust the claim.  The court agrees.

As a general rule, "[e]xhaustion of administrative remedies is a jurisdictional prerequisite to suit under Title VII."  *Clay v. UPS*, 983 F. Supp. 2d 1331. 1338 (D. Kan. 2013) (quoting *Jones v. Runyon*, 91 F.3d 1398, 1399 (10th Cir. 1996)).  The plaintiff bears the burden of establishing the court's subject-matter jurisdiction.  *See Southway v. Cent. Bank of Nigeria*, 328 F.3d 1267, 1274 (10th Cir. 2003).  "A plaintiff's claim in federal court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC."  *Jones v. UPS*, 502 F.3d 1176, 1186 (10th Cir. 2007) (quoting *MacKenzie v. City and Cnty. of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005)).  To exhaust administrative remedies, "the charge must contain facts concerning the discriminatory and retaliatory actions underlying each claim because each discrete incident of alleged discrimination or retaliation constitutes its own unlawful employment practice for which administrative remedies must be exhausted."  *Clay*, 983 F. Supp. 2d at 1338 (quoting *Manning v. Blue Cross and Blue Shield of Kansas City*, 522 Fed. Appx. 438, 440-41 (10th Cir. 2013)).  However, the court "liberally construes charges filed with the EEOC in determining whether administrative remedies have been exhausted as to a particular claim."  *Id.* (citing *Jones*, 502 F.3d at 1186).

Plaintiff failed to file a charge of constructive discharge with defendant's EEO office. Defendant's formal acknowledgement of plaintiff's EEO claims lists the following charges: (1) denial of 2010 annual evaluation, (2) inaccurate 2010 interim evaluation, (3) pressure to acknowledge 2010 interim evaluation, (4) taking blame for discrepancies for which plaintiff was not responsible, (5) change in supervisor, (6) change in sick-leave request procedure, and (7) change in location of workspace.  Dkt. 51-4, at 2-3.  There is no evidence in the record that plaintiff ever disagreed with this list as a *complete* listing of his claims against defendant.

Even now, plaintiff does not specifically controvert defendant's claim that he did not administratively exhaust a claim of constructive discharge.  In its Statement of Facts, defendant set forth the following:

> The Army's April 8, 2013 final decision on Cappell's EEO complaint does *not* include a claim that Cappell was forced to resign his job as a Maintenance Administrative Technician with the Army.

> Cappell did *not* administratively exhaust a claim for constructive discharge regarding his August 2012 resignation from his position as a Maintenance Administrative Technician with the Army.

Dkt. 51, ¶¶ 109, 110 (emphasis in original).  Plaintiff failed to specifically controvert these statements in his Opposition.  In fact, plaintiff's own statement of facts makes absolutely *no* mention of his alleged constructive discharge claim.  *See* Dkt. 57.  The court therefore finds that plaintiff failed to administratively exhaust a claim of constructive discharge.  As such, the court lacks subject-matter jurisdiction over this claim and it is dismissed.

The court further notes that *even if* plaintiff had administratively exhausted this claim, defendant would still be entitled to summary judgment.

> A constructive discharge occurs when a reasonable person in the employee's position would view [his] working conditions as intolerable and would feel that []he had no other choice but to quit.  In determining whether an employee's working conditions would cause such feelings in a reasonable person, we apply an

> objective test under which neither the employee's subjective views of the
> situation, nor [his] employer's subjective intent with regard to discharging [him],
> are relevant.   The question is not whether the employee's resignation resulted
> from the employer's actions, but whether the employee had any other reasonable
> choice but to resign in light of those actions.

*Tran v. Trs. of the State Colleges in Colo.*, 355 F.3d 1263, 1270 (10th Cir. 2004) (internal

citations omitted).

Here, there is simply no evidence that plaintiff, or any reasonable person in plaintiff's

position, would view his working conditions as intolerable and therefore feel as though he had no

other choice but to quit.   The latest civilian event that plaintiff complains of took place in

February 2011 when plaintiff changed workspaces.  Dkt. 51, ¶ 54.  However, Plaintiff continued

to work for defendant for another *eighteen* months after this move, eventually resigning on

August 8, 2012.  Dkt. 51-12, at 2.  Even then, plaintiff continued to work for another two weeks,

until August 20, 2012.  Dkt. 51-12, at 2; *see also Shelar v. Ameripride Servs.*, 2006 U.S. Dist.

LEXIS 45904, at *28 (D. Kan. July 6, 2006) (holding that "[g]iving several weeks notice of the

date on which one will be compelled to resign is unprecedented, in this court's experience, for a

successful constructive discharge claim).  Plaintiff's own actions belie his claim that his working

conditions were intolerable.

Furthermore, the record shows that, of those eighteen months, at least twelve were spent

under the direction of new supervisors.  Dkt. 51-3, at 34.  Plaintiff admitted that the situation was

better under these new supervisors and even thanked them in his resignation letter for their

"outstanding leadership skills and efforts in helping [him] cope with the situation."  Dkt. 51-3, at

34; Dkt. 51-12, at 2.  Finally, plaintiff admitted that he ultimately quit because he had a new job

opportunity, not because of the alleged intolerable conditions of his work environment.  Dkt. 51,

¶16.   Therefore,  even  if  plaintiff  *had*  administratively  exhausted  a  claim  for  constructive

discharge, defendant would still be entitled to summary judgment.  As such, plaintiff's claim of constructive discharge is dismissed for failure to exhaust administrative remedies.

**B.      Removal from Military Position**

Plaintiff's claim for loss of his military career meets a similar fate.  In the pretrial order, plaintiff alleges that "[t]he stress created by the constant pressuring and threats caused [plaintiff] to lose focus resulting in him failing his readiness level one check ride requirements."  Dkt. 49, at 6-7.  However, plaintiff's EEO charge made no claim of discrimination, retaliation, or harassment with regard to his military career.  As with his constructive discharge claim, "[e]xhaustion of administrative remedies is a jurisdictional prerequisite to suit under Title VII" for plaintiff's claim of the loss of his military career.  *Clay*, 983 F. Supp. 2d at 1338 (quoting *Jones*, 91 F.3d at 1399).  Plaintiff's EEO charge did not contain any facts concerning the discriminatory or retaliatory actions underlying a claim of the loss of his military career.  In fact, plaintiff's EEO charge did not mention the loss of his military career at all; rather, the charge stated only that the stress from plaintiff's civilian position "resulted in [him] being unable to perform [his] military duties."  Dkt. 51-13, at 2-6.  This is particularly telling, as plaintiff had been placed on a non-medical suspension just days before he reached out to defendant's EEO office.[4]  Therefore, the court grants defendant's motion for summary judgment on plaintiff's claim of loss of military career.[5]

---

[4] Plaintiff was issued his non-medical suspension on December 15, 2010. Dkt. 51, ¶ 89.  He made contact with defendant's EEO office on December 20, 2010.  Dkt. 51, ¶ 102.

[5] The court acknowledges defendant's argument that plaintiff's claim for loss of military career is also barred by the *Feres* doctrine, which arises out of the United States Supreme Court's decision in *Feres v. United States*, 340 U.S. 135, 146 (1950).  Originally intended to protect the United States from liability for injuries suffered by service personnel brought under the Federal Tort Claims Act, the rule has been expanded to include *all* injuries suffered by military personnel that are related to the individual's status as a member of the military.  *See Pringle v. United States*, 208 F.3d 1220 (10th Cir. 2000).  While many circuits have addressed the interaction between the *Feres* doctrine and claims brought under Title VII, as well as how the doctrine relates to dual-status employees, the Tenth Circuit has yet to directly address the issue of whether dual-status employees can bring claims under Title VII

## C.    Race Discrimination

Plaintiff next alleges that he was subjected to discrimination based on race and/or color as a result of the following incidents: (1) Reese's use of the term "fall guy," (2) negative comments in his 2010 interim evaluation, and (3) lack of an annual evaluation.  Title VII makes it unlawful "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2.  Discrimination may be proven through either direct or indirect evidence of discrimination.  *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000) (internal citations omitted).  Here, plaintiff fails to come forward with any direct evidence of discrimination.  The Court must therefore determine if there is sufficient indirect evidence for Plaintiff to survive summary judgment.

In the absence of any direct evidence, courts in this Circuit have used the widely known analytical framework articulated by the Supreme Court in *McDonnell-Douglas Corp. v. Green*. 411 U.S. 792 (1973).  This framework first requires a plaintiff to establish a prima facie case of discrimination.  *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014) (citing *MacKenzie*, 414 F.3d at 1274).  To do so, a plaintiff must demonstrate "(1) membership in a protected class, (2) adverse employment action, and (3) disparate treatment among similarly situated employees." *Monroe v. City of Lawrence*, 2014 U.S. Dist. LEXIS 9317, at *18-19 (D. Kan. Jan. 27, 2014) (quoting *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008)). Once established, the defendant employer must offer a "legitimate nondiscriminatory reason for the adverse employment action."  *Id.*  The burden then shifts back to the plaintiff to show that "there is at least a genuine issue of material fact as to whether the employer's

---

in light of *Feres*.  Because the court dismisses plaintiff's claim for loss of military career on other grounds, it declines to engage in a full analysis of the *Feres* issue.

proffered legitimate reason is genuine or pretextual."  *Id.*  Here, plaintiff fails to set forth a prima

facie case on any of his claims of race discrimination.

       1.      **Use of the term "fall guy"**

      In 2009, upon returning from flight school to his civilian employment, plaintiff

discovered errors with how payroll had been handled by Rickard in his absence.  These errors

were documented in plaintiff's 2009 annual evaluation.  When plaintiff questioned the inclusion

of these errors, he was allegedly told by Reese that he had to be the "fall guy," which meant, in

plaintiff's mind, that he had to be the one to "take the blame for the situation."  Dkt. 51-3, at 77.

According to plaintiff, he only had to take the blame because Rickard was Caucasian.  Dkt. 51-3,

at 78.

      Reese does not deny using the term "fall guy" in this discussion with plaintiff; however,

Reese stated that he explained to plaintiff that "owing to the nature of his [plaintiff's] job duties,

he is ultimately the person responsible for correcting pay errors, regardless of who initially made

them."  Dkt. 51-6, at 3.  Reese further stated that, by telling plaintiff that he had to be the "fall

guy," he was "trying to convey that, even if a pay error didn't originate with [plaintiff],

[plaintiff] was the one to whom employees would complain, and it was his job to ultimately fix

them."  Dkt. 51-6, at 3.

      Whatever Reese's intent behind the statement was is irrelevant because plaintiff fails to

show that Reese's statement, or any alleged consequence of that statement, resulted in an adverse

employment action.  As noted above, in order to maintain a prima facie case of race and/or color

discrimination, a plaintiff must demonstrate an adverse employment action.  *Monroe*, 2014 U.S.

Dist. LEXIS 9317, at *18-19 (quoting *Carney*, 534 F.3d at 1273).  "An adverse employment

action includes acts that 'constitute[] a significant change in employment status, such as hiring,

firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1268 (10th Cir. 2005) (citing *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998)).  The Tenth Circuit has traditionally defined the phrase "adverse employment action" liberally, taking a "case-by-case approach, examining the unique factors relevant to the situation at hand." *Hillig v. Rumsfeld*, 381 F.3d 1028, 1031 (10th Cir. 2004) (quoting *Sanchez,* 164 F.3d at 532).  It is important to note that, because of this case-by-case approach, adverse employment actions are not limited to particular specified acts. *EEOC v. C.R. Eng., Inc.*, 644 F.3d 1028, 1040 (10th Cir. 2011).

Here, plaintiff offers no proof that Reese's use of the term "fall guy,' or even the fact that plaintiff was allegedly being "forced" to take the blame for the mistakes of others, affected his civilian employment in any way.  There is no evidence that plaintiff suffered any change in his job, duties, pay, or benefits.  Indeed, plaintiff testified that the only proof he had of discrimination with regard to this incident was his own speculation because Rickard was Caucasian. Dkt. 51-3, at 45-46.  It is well established that a plaintiff's "feeling" that he is the victim of racial discrimination "fails to demonstrate a material issue of fact in the absence of supporting evidence." *Money v. Great Bend Packing, Co.*, 783 F. Supp. 563, 574 (D. Kan. 1992); *see also Arzate v. City of Topeka*, 884 F. Supp. 1494, 1501 (D. Kan 1995) (holding that "it is well settled that the plaintiff's own 'belief' or 'feeling' that he was the victim of disparate treatments is insufficient as a matter of law to prove age discrimination.").

The court therefore finds that plaintiff fails to maintain a prima facie case with respect to his "fall guy" claim.  As such, defendant's motion for summary judgment on this claim is granted and the claim is dismissed.

### 2.      2010 Interim Evaluation

Somewhat related to the "fall guy" statement is plaintiff's allegation that his supervisors included false statements in his 2010 interim evaluation.   Plaintiff underwent an interim evaluation on April 15, 2010.    Dkt. 53-1, at 188-91.  The initial evaluation documented four payroll errors for which plaintiff was held accountable. Dkt. 53-1, at 190.   When plaintiff disputed these findings, his second-level supervisor, Erkie, went back and reviewed the information.  Dkt. 51, ¶ 25.  Erkie then amended plaintiff's evaluation to identify only two payroll errors.  Dkt. 53-1, at 195.  Plaintiff again disagreed with the finding and refused to sign the evaluation.  Dkt. 51, ¶¶ 25, 26.

Not only does plaintiff fail to maintain a prima facie case on this claim, it appears, from plaintiff's own testimony, that there is no claim at all.  Despite his current allegations, plaintiff testified as follows:

> Q.      Okay.   Regarding your interim evaluation in 2010 . . . you said had statements that you disagreed with.   Are you claiming that those statements were placed in your interim evaluation because of your race?
>
> A.      No, I'm not, no, not because of my race, no.
>
> Q.      Are you claiming it was because of your color?
>
> A.      No.
>
> Q.      Are you claiming that they were placed in your interim review because of any EEO activity?
>
> A.      No.

Dkt. 51-3, at 44.

Even if plaintiff had not made those statements during his deposition, he still fails to show any adverse employment action.  Plaintiff makes no allegation and offers no evidence that, as a result of this interim evaluation, he suffered any kind of change in his job, duties, pay, or

benefits.  Plaintiff testified that it was his belief that these alleged false statements would be included in his final evaluation.  Dkt. 51-7, at 35.  However, Walsh testified that these statements would "not be added into the end of the rating cycle."  Dkt. 53-1, at 40.  Plaintiff offers no proof that these alleged false statements actually appeared in his 2010 final evaluation.  In fact, his 2010 annual evaluation was delayed *specifically* so that these statements would not be included.  Therefore, defendant's motion for summary judgment on this claim is granted and the claim is dismissed.

### 3.      2010 Annual Evaluation

As noted above, dual-status employees received an annual civilian evaluation only after working 120 consecutive days during the rating period.  Dkt. 53-1, at 92.  Because of military orders, dual-status employees sometimes did not work 120 consecutive days in their civilian position during a particular rating period.  This is exactly what happened to plaintiff; for the rating period ending September 30, 2010, he had not worked 120 *consecutive* days in his civilian position.  Dkt. 51-3, at 87; Dkt. 53-1, at 17.  Plaintiff was therefore ineligible for an annual evaluation at the normal time.[6]

Plaintiff's supervisors therefore had two choices: either conduct a special "close-out" evaluation of plaintiff, which would have been based on plaintiff's sporadic civilian performance after October 1, 2009, or wait until plaintiff returned to his civilian position and had worked 120 consecutive days.  Dkt. 51-2, at 4.  Plaintiff's supervisors opted to wait.  Dkt. 51-2, at 4. Plaintiff alleges that this decision was based solely on his race, as dual-status Caucasian employees who

---

[6] There is some discrepancy as to whether plaintiff worked 120 consecutive days in his civilian position from October 1, 2009, through September 30, 2010.  During his EEO testimony, plaintiff claimed that he worked 123 days from October 1, 2009, through the end of January 2010.  Dkt. 53-1, at 35-36.  However, plaintiff failed to provide any proof that these were 123 *consecutive* days.  Plaintiff later admitted in his deposition testimony that "he did not meet the 120 day requirement."  Dkt. 51-3, at 49.

had not satisfied the 120-day requirement were given special "close out" evaluations.  Dkt. 51-3, at 48; Dkt. 57, at 29-30.

Whether this is true is not relevant to plaintiff's prima facie case.   The Tenth Circuit has held that "Title VII does *not* make unexplained differences in treatment per se illegal nor does it make inconsistent or irrational employment practices illegal.   It prohibits only intentional discrimination *based upon* an employee's protected class characteristics." *EEOC v. Flasher Co.*, 986 F.2d 1312, 1319 (10th Cir. 1992).  Plaintiff once again fails to show how defendant's action, or lack thereof, in this case, was because of his race.  Plaintiff himself *admitted* that he was not entitled to receive his annual evaluation on December 15, 2010, because he had not worked 120 consecutive days in his civilian position.   Dkt. 51-3, at 49.   Plaintiff cannot now claim discrimination for being denied something he was never entitled to in the first place.  Furthermore, plaintiff offers no proof that that delay in his evaluation caused any harm or alteration to his job, duties, pay, or benefits.

And even if plaintiff could establish an adverse employment action, he fails to show "disparate treatment among similarly situated employees."  *Monroe*, 2014 U.S. Dist. LEXIS 9317, at *18-19.  "To be 'similarly situated' to the plaintiff, the other employee must 'share the same supervisor' or decision maker."  *Smothers*, 740 F.3d at 540 (quoting *EEOC v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 489 (10th Cir. 2006)).  Plaintiff admitted that he did not share the same first-level supervisor as those given special "close out" evaluations and that this difference could possibly account for the difference in evaluation procedure. Dkt. 51-3, at 50.

Finally, even if plaintiff could maintain his prima facie claim, defendant proffered a legitimate business reason for postponing plaintiff's 2010 annual evaluation.  Reese testified that

he chose to wait to administer plaintiff's annual evaluation after determining that "completing such an evaluation for [plaintiff] in late 2010 would not have been beneficial to [plaintiff] because, in our view, his performance had been subpar and prone to errors. Had he been given an annual evaluation at the end of 2010, it would not have been a successful rating." Dkt. 51-2, at 4. Plaintiff's evaluation, ultimately administered in July 2011, was indeed successful. Dkt. 51-3, at 92.

The burden therefore shifts back to Plaintiff to show that "there is at least a genuine issue of material fact as to whether the employer's proffered legitimate reason is genuine or pretextual." *Smothers*, 740 F.3d at 538 (citing *MacKenzie*, 414 F.3d at 1274). A plaintiff usually makes a showing of pretext in one of three ways:

> (1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff.

*Kendrick*, 220 F.3d at 1230 (internal citations omitted).

Here, plaintiff fails to allege pretext, let alone offer evidence to support any of these methods. There is no evidence to suggest that defendant acted in any way except in accordance with its personnel policies. As such, the court grants defendant's motion for summary judgment on this claim.

## D.    Retaliation

Plaintiff alleges that his remaining claims stem from retaliation for his December 2010 EEO complaint. Again, plaintiff offers no *direct* evidence of this alleged retaliatory behavior. The court therefore analyzes plaintiff's retaliation claims using the burden-shifting framework set forth under *McDonnell-Douglas*.

To establish a prima facie case for retaliation, a plaintiff must show: "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Proctor v. UPS*, 502 F.3d 1200, 1208 (10th Cir. 2007) (citing *Argo v. Blue Cross & Blue Shield of Kans., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006)).  Defendant does not contest that plaintiff engaged in protected activity, recognizing plaintiff's complaints to defendant's EEO Office as such activity.  Therefore, only the latter two elements are at issue.

The anti-retaliation provision of Title VII

> protects an individual not from *all* retaliation, but from retaliation that produces an *injury or harm* . . . [A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (emphasis added)).  Here, plaintiff's allegations of retaliation include: (1) pressure to sign the 2010 interim evaluation, (2) change of workspace, and (3) implementation of sick-leave procedures.

### 1.       Pressure to Sign the 2010 Interim Evaluation

Plaintiff first alleges that his supervisors, specifically Reese and Erkie, repeatedly pressured him to sign his 2010 interim evaluation in retaliation for his EEO complaint.  Dkt. 57, 7-10.  More specifically, plaintiff alleges that Erkie approached him "eight or nine times" between April and December 2010 requesting that plaintiff sign the evaluation.  Dkt. 51-3, at 78-80.  He also alleges that Erkie pressured him at some point between the time plaintiff contacted defendant's EEO Office on December 20, 2010, and January 1, 2011.  Dkt. 51-3, at 80-81.

Plaintiff presents no evidence that this alleged pressure was a materially adverse action. To be materially adverse, a retaliatory action must be sufficient to "dissuade a reasonable worker from making or supporting a charge of discrimination . . . While the employer's conduct need not affect the terms and conditions of employment, the inquiry is an objective one, and not based on a plaintiff's personal feelings." *Daniels v. UPS*, 701 F.3d 620, 638 (10th Cir. 2012). Here, we know that the alleged pressure did *not* dissuade plaintiff from filing an EEO claim because he filed his EEO claim *after* allegedly being subject to this pressure for six months.

Even if plaintiff could prove a materially adverse action, he fails to maintain the causation element of his prima facie claim. In 2013, the Supreme Court altered its view with respect to the causation requirement under Title VII. Title VII retaliation claims are now subject to a heightened "but-for" causation standard. Under this standard, "a plaintiff making a retaliation claim 'must establish that his or her protected activity was a *but-for* cause of the alleged adverse action by the employer.'" *Grote v. Beaver Express Serv., LLC*, 2013 U.S. Dist. LEXIS 115383, at *22-23 (10th Cir. 2013) (citing *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013) (emphasis added)). This standard "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 133 S. Ct. at 2533.

Here, plaintiff relies only on the short time period between his EEO complaint and the alleged pressuring to show causation. "To determine if plausible causation exists between [a plaintiff's] protected conduct and an adverse action, courts have looked at how close in time the protected conduct and adverse action are and how reasonable the inference is that the protected conduct was the cause of the adverse action." *Carroll v. Gradient Fin. Group, LLC*, 2013 U.S. Dist. LEXIS 93432, at *20 (D. Kan. July 2, 2013) (citing *Marx v. Schnuck Markets, Inc.*, 76 F.3d

324, 329 (10th Cir. 1996)).  However, "[e]ven where a plaintiff has established an inference of retaliatory motive based on time, he must still 'present . . . direct evidence of retaliatory animus or circumstantial evidence which adequately demonstrates that an improper motive was a substantial motivation in the employer's decision.'"  *Lombardo v. Potter*, 368 F. Supp. 2d 1178, 1195 (D. Kan. 2005) (quoting *Gonzagowski v. Widnall*, 115 F.3d 744, 749 (10th Cir. 1997)).  Here, plaintiff offers no additional evidence that this alleged "pressuring" was due to his EEO activity.  Furthermore, the court finds it curious that plaintiff alleges that the pressuring occurred from April to December 20, 2010, and is *not* considered by plaintiff to be retaliatory (admittedly because it cannot be retaliatory until plaintiff engages in protected activity), but then suddenly becomes retaliatory when it happened *once* after plaintiff made contact with defendant's EEO office.

Moreover, plaintiff admitted that he had no idea if Erkie, who allegedly was responsible for a majority of the pressure, was even aware of plaintiff's EEO activity.  Dkt. 51-3, at 81.  A plaintiff "cannot establish a causal connection between protected opposition and adverse employment action unless the employer *knew* that the employee had engaged in protected opposition."  *Grote*, 2013 U.S. Dist. LEXIS 115383, at *22 (emphasis added).  "The employer must know not only that the employee has opposed an action of the employer . . . , but that the opposition was based on a belief that the employer's action constituted discrimination prohibited by Title VII."  *Id*. (quoting *Zokari v. Gates*, 561 F.3d 1076, 1081 (10th Cir. 2009)).  Therefore, defendant's motion for summary judgment on this claim is granted.

### 2.    Change of Workspace

Plaintiff's next claim focuses on temporarily changing his workspace from the lower level of ASF Olathe upstairs to the Flight Operations Office.  Prior to February 2011, plaintiff

occupied a cubicle in the downstairs area of the ASF Olathe facility.  Dkt. 51, ¶ 48.  In February 2011, the military unit assigned to ASF Olathe was preparing to deploy to Afghanistan.  Dkt. 51, ¶ 49.  To facilitate this process and to assist Simpson with her duties, Walsh moved plaintiff upstairs to Flight Operations and closer to Simpson.  Dkt. 51, ¶ 53.  Walsh advised plaintiff's supervisors, Reese and Erkie, as well as Simpson's supervisor, Lewis, of the temporary move via email.  Dkt. 51-2, at 9.  Walsh testified that it was never his intent for plaintiff's supervisory chain to change, only that Lewis also be able to assign plaintiff work when necessary.  Dkt. 51-2, at 5.

Plaintiff now alleges that there was no legitimate business reason for the move because there were six other employees, four military personnel and two civilian employees, who could have assisted Simpson.  Dkt. 57, at 31.  This is evidenced by the fact, plaintiff argues, that the military unit deployed in March 2011 and plaintiff was not returned to his original workspace until July 2011.  Dkt. 57, at 32.  Plaintiff claims that the real reason he was moved was so that Erkie could continue harassing him (Dkt. 57, at 32) and to prevent other ASF Olathe employees from talking to him.  Dkt. 51-3, at 52-53.

Again, plaintiff provides no evidence that this temporary move was materially adverse. Plaintiff himself admitted that he "had no problems coming up there [to Flight Operations] and helping out with the workload."  Dkt. 51-7, at 64.  Plaintiff's only complaint, then, seems to be that he remained upstairs for nearly four months after the units deployed.  Dkt. 51-7, at 64. However, he sets forth no evidence showing that the temporary relocation, which this court views as a mere inconvenience, at best, could be viewed as an action that would dissuade a reasonable worker from making a complaint of discrimination.  The court does not consider a "mere inconvenience to be an adverse employment action."  *Young v. White*, 200 F. Supp. 2d

1259, 1276 (D. Kan. 2002) (citing *Sanchez*, 164 F.3d at 532).  As such, defendant's motion for summary judgment with regard to this claim is granted.

### 3.      Change in Sick-Leave Procedures

Plaintiff's final claim of retaliation is the alleged sudden change in his sick-leave request procedures.  As briefly mentioned above, in February 2011, plaintiff's supervisors began to notice that his sick-leave use fit an Army-established pattern indicative of potential leave abuse. Dkt. 51, ¶ 65.  Specifically, it was noted that plaintiff had used over sixty hours of sick-leave per year, often used sick-leave on the day before a weekend, and would sometimes take a full day of leave for a short appointment.  Dkt. 51, ¶ 65.  Plaintiff's supervisors were also concerned that he had begun "supervisor shopping," meaning that he would seek sick-leave approval from different supervisors.  Dkt. 51, ¶ 66.  As such, plaintiff's supervisors decided to more closely monitor his sick leave use.  Dkt. 51, ¶ 67.  Plaintiff was therefore asked to submit sick-leave requests only to Erkie or Walsh, to provide three-days' notice whenever possible, and to submit a doctor's note. Dkt. 51, ¶¶ 68, 95.

In plaintiff's Opposition, he alleges that this change in procedure was a direct result of his race, since there were Caucasian individuals who also fit the profile of a sick-leave abuser who were not asked to comply with the regulations.  Dkt. 57, at 33.  However, during his deposition testimony, plaintiff claimed the change in procedure was done in retaliation for his EEO complaint:

> Q.      Let's talk about at some point Mr. Erkie asked that your sick leave requests go through him, be approved by him?
> A.      By he or Mr. Walsh.
>
> . . .
>
> Q.      Are you claiming that occurred because of your race?
> A.      I would say that was retaliation.

Q.     Okay.  So not race?
A.     No.

. . .

Q.     So your claim that Mr. Erkie approving your sick leave is just a hunch that
       it was your EEO activity?
A.     No, it's retaliation.
Q.     Retaliation for your EEO activity?
A.     Yes.

. . .

Q.     Okay.  The requirement that – the rule that was given to you that you
       needed to provide a doctor's note for sick leave.  What evidence do you
       have that that was based on your – that that rule was imposed on you
       because of your race?
A.     It was retaliation.
Q.     So it was not because of your race?
A.     No.

. . .

Q.     Okay. Was the three days notice rule, was that because of your EEO
       activity?
A.     Yes, I think it was.

Dkt. 51-3, at 53, 54-55, 59.   The court therefore presumes that plaintiff is arguing this as a

retaliation claim.

     Plaintiff again fails to maintain his prima facie case.  He offers no evidence that this

change in sick-leave procedure was a materially adverse action.  Plaintiff admitted that he was

never denied sick leave.  Dkt. 51-3, at 56-57.  He also conceded that he "gladly provided"

doctor's notes and that doing so was standard operating procedure, as was making the request

three days in advance.  Dkt. 51-3, at 55-56, 58.  Plaintiff also admitted that he would take an

entire day of sick leave when his appointment lasted less than two hours and did so on a weekly

basis for counseling sessions.  Dkt. 51-7, at 61.  Plaintiff fails to provide any evidence of harm as

a result of the change in sick-leave procedure.  Likewise, plaintiff has no proof that retaliation

was a but-for cause of this change.  When specifically asked for this evidence, plaintiff  pointed

only to the fact that the change occurred after he filed his EEO complaint. Dkt. 51-3, at 55.  Mere

timing, without more, is not sufficient to establish causation.  *Lombardo*, 368 F. Supp. 2d at

1195.

Even if plaintiff could maintain his prima facie case, defendant proffers a legitimate

business reason for implementing the procedure.  Walsh testified during the EEO proceedings

that plaintiff, along with others, fit the profile of a potential sick-leave abuser according to

guidelines issued by defendant's Office of Personnel Management.  Dkt. 53-1, at 113-15.  It was

only then that plaintiff's sick leave was more closely monitored.  Dkt. 53-1, at 116.  Plaintiff

offers no evidence of pretext in response to this reason.  As such, defendant's motion for

summary judgment on this claim is granted.

### E.    Harassment/Hostile Work Environment

Finally, plaintiff alleges that he was subject to harassment and a hostile work

environment.  However, he offers no explanation as to the nature of this allegedly hostile

environment.  Rather, plaintiff simply alleges that "[t]he three supervisors discriminated and

retaliated against a protected class.  Their behaviors were pervasive, lasting over time and the

hostility seriously disrupt [sic] my work and interfered with my career progress as a civilian and

soldier."  Dkt. 57, at 34.  It seems, given his reference to a "protected class," that plaintiff is

alleging racial harassment.  The court will therefore proceed with an analysis of a hostile work

environment based on race.

"Title VII forbids employment discrimination on the basis of race . . . ." *Herrera v.*

*Lufkin Indus.*, 474 F.3d 675, 680 (10th Cir. 2007) (quoting *Chavez v. New Mexico*, 397 F.3d 826,

831 (10th Cir. 2005)).  "This includes an employee's claims of a hostile work environment based on race . . . discrimination."  *Id.* (citing *Chavez*, 397 F.3d at 831-32).  To survive summary judgment on a claim alleging a racially hostile work environment, a plaintiff "must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and that the victim was targeted for harassment because of his . . . race . . . ."  *Id.* (internal citations omitted).

Here, plaintiff fails to assert sufficient evidence from which a jury could find that his work environment was racially hostile.  Plaintiff admitted that he was not aware of any racial comments or slurs, made either by his colleagues or his supervisors, during his time at ASF Olathe.  Dkt. 51-3, at 99.  In fact, the only racial comments or jokes that plaintiff did admit to hearing were ones that he participated in.  Dkt. 51-3, at 99.

Plaintiff attempts to bolster his harassment claim by alleging that the word "rat" appeared on a poster on a bulletin board outside his office and that Walsh attempted to incite racial tension between plaintiff and another employee with whom plaintiff admittedly exchanged racial jokes. Dkt. 51-3, at 60, 67.  These alleged isolated incidents do not rise to the level of a hostile work environment.  "To establish a racially hostile work environment . . . plaintiffs must prove more than a few isolated incidents of racial enmity." *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1412 (10th Cir. 1987) (quoting *Snell v. Suffolk Co.*, 782 F.2d 1094, 1103 (2d Cir. 1986)).  "Casual comments, or accidental or sporadic conversation, will not trigger equitable relief pursuant to the statute."  *Id.*  Plaintiff admitted that the word "rat" was immediately removed from the bulletin board.  Dkt. 51-3, at 60.  He also concedes that, even if Walsh tried to incite racial tension (of which he has no proof), the result was only a "little racial tension."  Dkt. 51-3, at 67.

Even if plaintiff could establish a prima facie case of harassment, he cannot impute liability to defendant. "An employer may be directly or vicariously liable for a hostile workplace." *Debord v. Mercy Health Sys. of Kan., Inc.*, 737 F.3d 642, 650 (10th Cir. 2013) (citing *Burlington Indus. v. Ellerth*, 524 U.S. 742, 758-59 (1998)). "An employer is directly liable for a hostile work environment created by an employee if the employer's negligence causes the actionable work environment." *Id.* (quoting *Baty v. Willamette Indus.*, 172 F.3d 1232, 1241 (10th Cir. 1999)). "An employer is negligent . . . *if it knew or should have known* about the conduct and failed to stop it." *Id.* (quoting *Ellerth*, 524 U.S. at 759) (emphasis added). Here, plaintiff admitted that the only complained-of harassment, the writing of the word "rat" on a poster, was immediately removed by his supervisors. Dkt. 51-3, at 60.

Plaintiff alleged in his EEO testimony that he told Erkie that "he [Erkie] was leaning towards harassment and [plaintiff] would seek legal guidance." Dkt. 53-1, at 56. However, there is no evidence in the record that plaintiff ever made an official complaint of harassment. Based on this lack of evidence, the court finds that no reasonable jury could find that plaintiff suffered racial harassment. The court therefore grants defendant's motion for summary judgment on this claim.

**IT IS THEREFORE ORDERED** this 6th day of November, 2014, that defendant's Motion for Summary Judgment (Dkt. 50) is hereby granted. It is also ordered that defendant's Motion to Strike (Dkt. 52) is granted.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE